IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION - CINCINNATI

| | |
|---|---|
| LARHONDA J. STROZIER, | Case No. 1:17-cv-817 |
| Plaintiff, | Judge Matthew W. McFarland |
| v. | |
| WARREN COUNTY, OHIO, | |
| Defendant. | |

## OPINION AND ORDER

This matter is before the Court on Defendant Warren County's Motion for Summary Judgment (Doc. 17). For the reasons discussed more fully below, the Court **GRANTS** Warren County's Motion for Summary Judgment (Doc. 17) and **DISMISSES WITH PREJUDICE** Plaintiff LaRhonda Strozier's claims against Warren County.

## UNDISPUTED FACTS

Ms. Strozier was employed as a corrections officer (CO) at the Warren County Jail (Jail) from April 2005 to April 2018, when she resigned from her employment. (Strozier Declaration (Decl.) (Doc. 23-1), ¶ 2). The Jail, operated and administered by Warren County, is an adult detention center for minimum, medium, and maximum-security inmates and houses both male and female inmates. (Affidavit of Warren County Sheriff Larry Sims (Sims Aff.) (Doc. 17-1), ¶4). The Jail has a maximum capacity of 224 male inmates and 66 female inmates. (*Id.*). The majority of the inmates at the Jail have been charged with felonies, drug offenses, and crimes of violence. (*Id.*, ¶12).

The responsibilities of a CO at the Jail, whether male or female, are essentially the same, and include conducting rounds, supervising and monitoring the daily activities of inmates, processing (showering-in) inmates coming into and exiting (showering-out) the facility, security checks, strip searches, and fingerprinting. (Sims Aff. (Doc. 17-1), ¶5). Daily task assignments vary and rotate among male and female COs. (*Id.*). These rotating tasks do not affect promotional opportunities, pay, benefits, or seniority. (*Id.*). Warren County concedes, however, that "[s]ome task assignments are gender-based." (Doc. 17, PageID 277).

The female inmates at the Jail are housed in the C-Pod unit. (*See* Affidavit of Chief Deputy Barry Riley (Riley Aff.) (Doc. 17-5), ¶15). At least two female COs and two male COs work each shift at the Jail. (Sims Aff. (Doc. 17-1), ¶13; Riley Aff. (Doc. 17-5), ¶14). One of the two female COs is assigned to perform rover duties in the C-Pod. (Strozier depo. (Doc. 16), PageID 80). The "rover" conducts security rounds and monitors, assists, and supervises the female inmates in the C-Pod. (*Id.*). Security rounds require visual checks of each female inmate every 59 minutes. (Sims Aff. (Doc. 17-1), ¶19; Riley Aff. (Doc. 17-5), ¶18). The rover moves about the C-Pod and monitors all areas, including showering and toilet areas that are partitioned from complete view by the control room attendant. (*Id.*). Per Jail policy, the rover in the C-Pod is required to be female. (Strozier Decl. (Doc. 23-1), ¶3; Sims Aff. (Doc. 17-1), ¶20). One reason the C-Pod rover is required to be female is because male COs cannot go beyond artificial barriers (such as shower curtains or toilet-stall walls) within the female housing units

2

without first announcing their intent to do so, creating a risk that inmates could avoid detection of improper or unsafe conduct. (Sims Aff. (17-1), ¶22).

The second of the two female COs working each shift may be assigned to another post, but is available to be called to booking to do showering in/out of female inmates, as well as strip searches of female inmates, when necessary. (Sims Aff. (Doc. 17-1), ¶15). The showering in/out process of female inmates is monitored by a female CO. (*Id.*, ¶16). During the showering in/out process, inmates are escorted to a room where they must remove all clothing and are subject to an aggressive visual observation. (*Id.*, ¶17).

Ohio law requires female COs to perform strip searches, when necessary, of female inmates and male COs to perform strip searches of male inmates. Ohio Rev. Code § 2933.32. Jail policy requires two COs to conduct each strip search. (Riley Aff. (Doc. 17-5), ¶12). Strip searches are inherently dangerous, as there is always the potential that an inmate may become aggressive, combative, or disruptive, or that a medical emergency may arise. (*Id.*, ¶¶10, 12). The policy of requiring two COs to conduct a strip search "protects the officers and the inmate from allegations of misconduct and provides safe management of the scene, accountability of contraband discovered and verification of what occurs." (*Id.*, ¶12). When a female CO is not available for showering in/out or strip-search duties, female inmates are placed in holding cells. (Strozier Decl. (Doc. 23-1), ¶9). Female inmates are permitted to remain in holding cells for twelve hours. (*Id.*).

Male COs are permitted to work the control room in C-Pod. (Strozier Decl. (Doc. 23-1), ¶10). Ms. Strozier states that "[t]here are no doors on the cells of C-Pod, hence,

3

male COs working in the C-Pod control room are able to see directly into several of the female cells (notably, cells 128, 201, 225 and 229). These male COs are able to see female inmates in these cells using the restroom and disrobing." (*Id.*). "Moreover, male COs conduct rounds in the overflow unit when females are housed in that unit." (*Id.*). "There are no doors on the cells in the overflow unit, and hence, male COs are able to see female inmates using restrooms." (*Id.*). "Finally, male supervisors conduct rounds in the C-Pod housing unit, so there are already male employees on C-Pod." (*Id.*). Jail policy prohibits male COs from observing disrobed female inmates, absent exigent circumstances. (Sims Aff. (Doc. 17-1), ¶21). All three female sergeants at the Jail are trained to perform strip searches and occasionally assist with this task. (Strozier Decl. (Doc. 23-1), ¶11). Three sworn female officers are trained to perform strip searches. (*Id.*, ¶12).

COs at the Jail work five days (shifts) per week and are off two days (shifts) per week. (Riley Aff. (Doc. 17-5), ¶ 5). Given the requirement that two female COs are required to work each shift and that a female CO is required to work as a rover for C-Pod, female COs are required to work female-only overtime. (Strozier Decl. (Doc. 23-1), ¶3). A female is required to work overtime at the Jail on those occasions when staffing falls short due to unexpected absences of COs reducing the number of female COs to below two on a shift. (Sims Aff. (Doc. 17-1), ¶24). Required female-only overtime is used sparingly and as a last resort at the Jail. (*Id.*). Work by COs in excess of eight hours in any calendar day or more than 160 hours within 28 calendar days is compensated by overtime pay or compensatory time at the election of the employee, as

4

set forth in a collective bargaining agreement. (*Id.*, ¶25). Male COs are also forced to work overtime at the Jail. (*Id.*, ¶28). The amount of female-only overtime during the last five years of Ms. Strozier's employment at the Jail was less than 3.47% of the total overtime awarded. (Riley Aff. (Doc. 17-5), ¶23). Ms. Strozier states that during the last three years of her employment with Warren County, she was required to work female-only overtime or forego days off on no less than thirty-five occasions. (Doc. 23, at PageID 610 (citing Strozier Decl. (Doc. 23-1), ¶4, Ex. 1)). The most significant need for female-only overtime occurred during the last year and one-half of Ms. Strozier's employment. (*See* Sims Depo. (Doc. 21), PageID 485). Promotional opportunities or seniority of COs at the Jail are not affected by overtime. (Sims Aff. (Doc. 17-1), ¶29).

Warren County has aggressively recruited to assure adequate staffing levels of male and female COs, but there has been a significant reduction of qualified candidates over the past few years. (Riley Aff. (Doc. 17-5), ¶26). Further, the difficulty of recruiting female COs is magnified, given that the ratio of female to male applicants is 1 to 4. (*Id.*). When staffing decreases, overtime temporarily increases while qualified new recruits can be hired and trained. (Riley Aff. (Doc. 17-5), ¶27).

In April 2018, there was at least one new female CO at the Jail. (Strozier depo. (Doc. 16), PageID 171). In May 2018, additional new female COs, who were hired in February and March, started working. (Riley Aff., (Doc. 17-5), ¶29). The amount of required female-only overtime at the Jail decreased in the months of June, July, and August 2018. (*Id.*, ¶30).

5

In October 2016, Ms. Strozier filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC), alleging sex discrimination. (*See* Doc. 1, PageID 2; Doc. 1-2). On November 6, 2017, the Department of Justice notified Ms. Stroizier that it would not file suit on her behalf and issued a notice of right to sue. (Doc. 1-4). Mr. Strozier timely filed this action on December 4, 2017. (*See* Doc. 1).[1]

In her complaint, as amended (Docs. 1, 25), Ms. Strozier asserts that while she was employed as a CO with Warren County she was subjected to additional burdens in determining scheduling, off days, post rotations, and assignments because of her sex in violation of 42 U.S.C. § 2000e-2 (Count One)[2] and Ohio Revised Code § 4112, *et seq.*, (Count Two). (*See* Doc. 1, PageID 3).

## SUMMARY JUDGMENT STANDARD

Courts must grant summary judgment if "the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). Once a defendant has met its initial burden of showing that no genuine issue of material fact

---

[1] Attached to the Complaint is an August 10, 2017 Determination containing a "finding that there is a reason to believe that a violation has occurred." (Doc. 1-3). "However, an EEOC determination is not binding on the trier of fact in a discrimination action and, thus, has no bearing on the Court's determination on the merits of the Plaintiff's case." *Crawford v. Muvico Theaters, Inc.*, No. 04-2720 B, 2006 WL 522391, at *1 (W.D. Tenn. Mar. 2, 2006) (*citing Lindsey v. Prive Corp.*, 161 F.3d 886, 894 (5th Cir.1998)).

[2] Ms. Strozier's complaint inadvertently refers to Count One as a race discrimination claim. (*See* Doc. 1, at PageID 4). However, at her deposition, she clarified that Count One alleges sex discrimination only. (*See* Strozier Depo. (Doc. 16), PageID 100-01, 106).

remains, the plaintiff must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Although "a court must view the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the nonmoving party," *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007), this requirement does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's wholly unsupported allegations. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (*citing Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). The plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Rather, the plaintiff must present "significant probative evidence . . . on which a reasonable jury could return a verdict" in their favor. *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009).

## ANALYSIS

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any employee with respect to her terms, conditions, or privileges of employment, because of the employee's sex. 42 U.S.C. § 2000e–2(a)(1). The elements of a gender discrimination claim under Title VII and Ohio Rev. Code § 4112.02(A) are the same. *See Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St. 3d 169, 175, 729 N.E.2d 726 (2000) ("federal case law interpreting Title VII . . . is generally applicable to

7

cases involving alleged violation of [Ohio Rev. Code §] 4112."). Accordingly, the Court considers Counts One and Two of the complaint, as amended, together.

This is not the first time the staffing plan at the Jail has been challenged in this Court. *In Million v. Warren Cty., Ohio*, No. 1:16-CV-746, 2020 WL 815591 (S.D. Ohio Feb. 19, 2020) (Cole, J.), *appeal filed*, No. 20-3312 (6th Cir. Mar. 19, 2020), the Court upheld the Jail's staffing plan against similar discrimination claims as a bona fide occupational qualification (BFOQ). The Court's analysis in *Million* is instructive and is followed here. Because Ms. Strozier has failed to create a genuine dispute as to the existence of any reasonable alternatives to staffing plan at issue, summary judgment in favor of Warren County is warranted in this case.

As noted above, Ms. Strozier asserts that while she was employed as a CO with Warren County, she was subjected to additional burdens in determining scheduling, off days, post rotations, and assignments because of her sex. (*See* Doc. 1, PageID 3). Warren County concedes in its motion for summary judgment that the Jail has adopted a facially discriminatory staffing plan in that "some task assignments are gender-based" and that "at least two female [COs] . . . must, therefore, work each shift, each day at the [Jail]." (Doc. 17, PageID 277).

As this Court explained in *Million*:

> Where a plaintiff has submitted a defendant's facially discriminatory policy, the plaintiff has provided direct evidence of discrimination that violates Title VII's prohibition against disparate treatment. . . . [I]n that setting, an employee need not show a particular "adverse action." Rather, the sole remaining issue becomes "whether such overt disparate treatment is for some reason justified under Title VII." [*Everson v. Michigan Dep't of Corr.*, 391 F.3d 737, 747 (6th Cir. 2004)] (quoting *Reed v. Cnty. of Casey*, 184

8

F.3d 597, 599 (6th Cir. 1999)). In particular, while Title VII generally prevents overt discrimination, a narrow exception exists if the disparate treatment results from a bona fide occupational qualification (BFOQ). *Id.*

*Million,* 2020 WL 815591, at *7.

To the extent that Warren County argues that it need not meet the BFOQ exception because the policy at issue is reasonable and imposes only a "minimal restriction" on the employee (Doc. 17, PageID 281-84), this Court rejected that argument in *Million*.

> [T]he Sixth Circuit has not adopted the Eighth (or Ninth) Circuit's approach [in *Tipler v. Douglas Cty.*, 482 F.3d 1023, 1025 (8th Cir. 2007) and *Tharp v. Iowa Dep't of Corr.*, 68 F.3D 223, 225-27 (8th Cir. 1995)] under which prisons need not meet the BFOQ framework to justify gender-based policies. *See id.; see also Robino v. Iranon*, 145 F.3d 1109, 1110 (9th Cir. 1998) (adopting the *Tharp* test). To be sure, in *Everson*, the Sixth Circuit acknowledged the deference that courts owe to prison officials, citing *Tharp*. *See Everson*, 391 F.3d at 750. But after finding that the Michigan prison's policy there amounted to overt disparate treatment, the *Everson* court applied that deference *to the BFOQ analysis*. In other words, while *Tipler* and *Tharp* found that the deference owed to prison officials precludes the need for a BFOQ analysis at all, *Everson* instead teaches that a BFOQ analysis continues to apply but presents a lower hurdle in the prison setting than it would elsewhere.
>
> *Everson* is binding precedent on this Court. It also makes sense. *Everson's* approach reflects the notion, also apparent in other areas of the law, that the same analytical labels typically apply in prison as elsewhere, but the analysis underlying those labels may differ to take account of the unique prison environment. In *Cutter v. Wilkerson*, 544 U.S. 709 (2005), for example, the Supreme Court noted that RLUIPA's "compelling governmental interest standard" still applied, but that "context matters in the application of that standard." *Id.* at 723 (quotation omitted). In particular, Congress intended courts to apply the standard with "due deference to the experience and expertise of prison and jail administrators." *Id.* (quoting S. Rep. No. 102-111, at 10. U.S.C.C.A.N. 1993, pp. 1892, 1899, 1900) (internal quotation omitted)); *see also Hoevenaar v. Lazaroff*, 422 F.3d 366 (6th Cir. 2006) (reversing district court in RLUIPA matter for failing to give proper deference to prison officials). Nor is such deference limited to RLUIPA matters. *See, e.g., Bazzetta v. McGinnis*, 124 F.3d 774 (6th Cir. 1997)

9

> (noting in a § 1983 action that "problems of prison administration are peculiarly for resolution by prison authorities and their resolution should be accorded deference by the courts"); *Bills v. Klee*, No. 15-cv-11414, 2020 WL 702805 (E.D. Mich. Feb. 12, 2020) (applying *Bazzetta*).
>
> Nor is it at all surprising that courts have concluded that deference to prison administrators is warranted in many contexts. As the Sixth Circuit noted in *Everson*, "courts defer to the judgments of prison administrators not simply because of their expertise[,]" but also due to "the ability of administrators to plan and muster resources, the primary nature of the executive—as opposed to the judicial—branch of government to run the prisons, and the respect owed to state sovereignty by the federal judiciary." *Everson*, 391 F.3d at 752 (citing *Turner v. Safley*, 482 U.S. 78, 85 (1987)). As there is no doubt that prison officials often deal with dangerous and unique settings, an approach under which judges freely substitute their own views of "reasonableness" for that of prison officials not only invites misguided policy changes, but also may exacerbate dangers to inmates or prison staff. That is not to say that judges can never intercede in the prison environment, but it is to suggest that judges should be careful in doing so, and confirms that *Everson* was wise to make the BFOQ analysis more deferential in the prison setting than elsewhere.
>
> In short, the Court rejects Warren County's argument that it need not meet the test for a BFOQ in order to justify its gender-based policy, but holds that the BFOQ analysis is different in the prison setting. With that understanding, the difference between *Everson*, on the one hand, and *Tharp* and *Tipler*, on the other, may be more one of semantics than substance. Whether saying the BFOQ analysis does not apply in the prison setting so long as policies are reasonable (*Tharp* and *Tipler*), or instead saying that the BFOQ analysis should be viewed through the lens of deference such that gender-based policies meet the standard so long as they are reasonable (*Everson*), the end result is largely the same—the BFOQ showing that Warren County must make is less demanding than it would be for other employers that adopt policies that expressly rely on gender in making employment decisions. Whether the policy here meets that standard is the issue to which the Court turns next.

*Million*, 2020 WL 815591, at *8.

The undersigned agrees that *Everson* provides the proper standard for evaluating Ms. Strozier's claims. Thus, the Court turns to Warren County's alternative argument

10

(*see* Doc. 17, PageID 287-89) that it meets the requirements for a BFOQ. For the reasons below, the Court finds that Warren County has established the BFOQ defense.

Under *Everson*, Warren County must satisfy a three-prong test to establish the BFOQ defense:

> (1) it had a "basis in fact" for its belief that gender discrimination is "reasonably necessary"—not merely reasonable or convenient—to the normal operation of its business; (2) the job qualification relates to the essence, or to the central mission, of the employer; and (3) that no reasonable alternatives exist to discriminating based on sex.

*Million*, 2020 WL 815591, at *9 (quoting *Everson*, 391 F.3d at 748-49). Because Ms. Strozier limits her argument in her opposition to summary judgment to Warren County's ability to satisfy the third BFOQ prong (*see* Doc. 23, PageID 610, 617-22), she has waived any challenge to Warren County's ability to meet the first two prongs. *See Haji v. Columbus City Sch.*, No. 2:10-CV-33, 2012 WL 12527193, at *12 (S.D. Ohio Apr. 4, 2012), *aff'd*, 621 F. App'x 309 (6th Cir. 2015). However, for the sake of completeness, the Court will address all three prongs of the BFOQ defense.

### A. Warren County Has Satisfied the First BFOQ Prong.

To satisfy the first prong, Warren County must establish that "all or substantially all members of one gender would be unable to perform safely and efficiently the duties of the job involved." *Everson*, 391 F.3d at 748 (citations omitted). In determining whether Warren County has carried this burden, the Court must "defer to the judgments of prison administrators." *Id.* at 752.

11

Considering an analogous factual record, the Court in *Million* found that Warren County satisfied the first prong. Because the Court's analysis in *Million* is instructive, it is set forth below:

> Warren County asserts that male corrections officers are unable to perform some of the duties necessary to safely and efficiently operate a female-only jail block (C-Pod), such as monitoring female inmates' activities in the showers and bathrooms and performing strip searches on female inmates during intake. As a result, Warren County claims that it must have at least two female corrections officers working each shift. This is true, Warren County contends, for three reasons. . . . First, requiring that the officers and inmates involved in a strip search are all the same gender is reasonably necessary to protect the privacy of the inmate, and is in fact required by law. *See* Ohio Rev. Code § 2933.32(A)(6). Second, this practice is implemented to manage risk, and is consistent with correctional best practices and federal policy promoting "zero tolerance" for inmate sexual assaults. *See* Prison Rape Elimination Act, 42 U.S.C. § 15601 *et seq.* Third, Warren County also explains why two officers, as opposed to one, are necessary for such searches: "There is a potential during every strip search that an inmate may become aggressive, disruptive, or combative or a medical or other emergency may arise. The presence of a second corrections officer allows for . . . verification of what occurs during the search, better documentation, better risk management, and protection of both the officer performing the search and the inmate being searched."

*Million*, 2020 WL 815591, at *9. Warren County advances the same justifications in this case for its requirement that two female COs work each shift. (*See* Doc. 17, PageID 277-78). The Court is persuaded that Warren County has met the first BFOQ prong here.

**B.     Warren County Has Satisfied the Second BFOQ Prong.**

Turning to the second prong, Warren County must establish that its staffing plan relates to the Jail's "central mission." *Everson*, 391 F.3d at 753–54. The Court's decision in *Million* is again instructive:

> Warren County explained [that] the reason for its gender discrimination policy is to safeguard the inmates' well-being and privacy. The Sixth

12

> Circuit itself has uniformly held that "it is beyond cavil that 'privacy' relates to the essence of" the Jail's business. *Everson*, 391 F.3d at 759; *see Reed*, 184 F.3d at 599. The same is true for the Jail's duty to maintain a safe, secure rehabilitation environment. *See id.*; *see also Reed*, 184 F.3d at 600. For these reasons, Warren County has established that its policy meets the second BFOQ prong.

*Million*, 2020 WL 815591, at *10. Applying the same analysis to the facts in this case, Warren County has met the second BFOQ prong. (*See* Riley Aff. (Doc. 17-5), ¶¶10, 12).

## C. Warren County Has Satisfied the Third BFOQ Prong.

As for the third prong, Warren County asserts: "No reasonable alternatives exist to this two female minimum staffing requirement of the Warren County Jail, without which same sex personnel for conducting strip searches as they may arise, as mandated by law, would be inadequate." (Doc. 17, at PageID 288). In her opposition to summary judgment, Ms. Strozier offers the following five alternatives: (1) allowing one of three female sergeants on a shift to count towards the two-female minimum; (2) keeping female inmates in one of three holding cells until another female CO arrives on her shift to complete a strip search or until a sworn female officer with strip-search training arrives to observe the search; (3) purchasing a body scanner to avoid the need for strip searches; (4) installing video equipment whereby one female CO could conduct the search and a second CO (either male or female) could monitor the search from the control room, and (5) allowing male COs to work as C-Pod rovers and eliminating the need for two female COs to perform strip searches. (Doc. 23, PageID 619-22).

The Court will consider the proposed alternatives in the order presented. Warren County points to Sheriff Sims's deposition testimony to counter the first

13

proposed alternative. During his deposition, Sheriff Sims testified that allowing female supervisors to work mandatory overtime shifts for female COs would result in a collective bargaining violation. He also testified that female supervisors have too many responsibilities of their own during any given shift to replace a female CO. (*See* Sims Depo. (Doc. 21), PageID 504). Although Ms. Strozier contends that female sergeants occasionally assist with strip searches (Strozier Decl. (Doc. 23-1), ¶11), she does not otherwise address Warren County's concerns. Ms. Strozier has not created a genuine issue of fact as to whether regularly using female sergeants to assist with strip searches is a reasonable alternative. *See Matsushita*, 475 U.S. at 586-87 (requiring more than "some metaphysical doubt as to the material facts" to create a genuine issue for trial).

As to the second proposed alternative of keeping female inmates in holding cells until a female CO arrives on her shift to complete a strip search, the Court in *Million* identified why this is not a viable option. "Holding those female inmates who require a strip search at intake until a shift that happens to have two female officers assigned may leave incoming female inmates in the intake holding cell for an indeterminate period of time." *Million*, 2020 WL 815591, at *10. The undersigned agrees. As to Ms. Strozier's additional suggestion of utilizing sworn female officers (i.e. deputy sheriffs (*see* Doc. 30, PageID 706)) to assist with strip searches, Sheriff Sims testified in his deposition that such a cross-over in duties was prohibited by the collective bargaining agreement and, in any event, training differences in the two positions prevented sworn female officers from fulfilling this role. (*See* Sims Depo. (Doc. 21), PageID 469-70, 505). Ms. Strozier contends that three sworn female officers are trained to perform strip searches.

(Strozier Decl. (Doc. 23-1), ¶12). Even assuming Ms. Strozier could create a genuine issue of fact as to training, she has not addressed Warren County's concerns regarding the collective bargaining agreement. Further, this proposed alternative presents another problem. If none of the three sworn female officers are on duty, or a female CO is unexpectedly absent, female inmates could be required to remain in holding cells for longer than twelve hours.

Ms. Strozier's third proposed alterative is that the Jail use a body scanner. Warren County responds that body scanners cannot be used in the Jail as it is currently configured. (Supplemental (Supp.) Riley Aff. (Doc. 30-1), ¶16). Warren County further responds that limitations on the use of body scanners and the possibility of an equipment failure would not eliminate the need for two same sex COs to be on duty at all times. (*Id.*, ¶17). Ms. Strozier has not pointed to facts in the record supporting this alternative and, based on the record before it, the Court is unable to find that a genuine issue of fact exists. *See Anderson*, 477 U.S. at 248 (requiring "specific facts showing that there is a genuine issue for trial.").

Regarding the fourth proposed alternative, Ms. Strozier asserts that PREA supports installing video monitoring equipment for strip searches. (Doc. 23, PageID 620). PREA's "implementing regulations require facilities to 'develop, document, and make its best efforts to comply on a regular basis with a staffing plan that provides for adequate levels of staffing, and, where applicable, video monitoring, to protect inmates against sexual abuse' taking into consideration factors such as the prevalence of incidents of sexual abuse and the facility's physical layout. 28 C.F.R. § 115.13(a)(5)."

15

*Tangreti v. Semple*, No. 3:17-CV-01420 (MPS), 2019 WL 4958053, at *18 n.13 (D. Conn. Oct. 8, 2019). However, that video monitoring may be useful to protect inmates from sexual abuse is not to say that video monitoring is itself an effective alternative to the Jail's requirement that two COs be present to conduct a strip search. Ms. Strozier has not established that video monitoring is an effective alternative for managing other risks associated with strip searches, such as to the officer performing the strip search. (*See* Riley Aff., ¶12 ("Because strip searches are used to discover concealed evidence including drugs and weapons, there is always potential during every search that an inmate may become aggressive, combative, or disruptive . . . .")). Nor has Ms. Strozier established that video monitoring of a strip search of a female inmate by a male CO would be permitted under Ohio law, which requires strip searches to be conducted by persons who are of the same sex as the person who is being searched. Ohio Rev. Code § 2933.32. Further, in its reply, Warren County states that "[v]ideo monitoring of . . . strip searches, i.e. persons being unclothed or in an unclothed state, is prohibited in Ohio jails" and is not as effective for discovering contraband. (Supp. Riley Aff. (Doc. 30-1), ¶¶16-17). As above, Ms. Strozier has not presented evidence that would allow the Court to find a genuine dispute as to whether video monitoring provides a reasonable alternative.

Finally, the fifth proposed alternative, i.e., allowing male COs to serve as rovers in the C-Pod and eliminating the need for two female COs to perform strip searches of female inmates, presents several problems. Part of the rover's responsibilities in C-Pod are to monitor female inmates while they are showering or in the toilet area—tasks that

16

Jail policy prohibits male COs from performing, except in exigent circumstances. (Sims Aff. (Doc. 17-1), ¶21). Ms. Strozier points out that male COs and supervisors are present in the C-Pod and may, as a practical matter, encounter female inmates in the restroom or disrobing. (Strozier Decl. (Doc. 23-1), ¶10). However, the rover's responsibilities involve more than occasional encounters with female inmates who may be disrobed. Rovers in the C-Pod monitor inmate showering and in toilet areas. (Sims Aff. (Doc. 17-1), ), ¶19). The Jail has explained that announcing requirements prevent male COs from effectively serving as C-Pod rovers. (*Id.*, ¶22). Further, the Jail's policy of requiring two COs to perform each strip search is consistent with state and federal best practices regarding adequate staffing. *See Tangreti*, 2019 WL 4958053, at *18 (citing 28 C.F.R. § 115.13(a)(5)); Ohio Admin. Code § 5120:1-8-17(D)(1) (requiring a written policy addressing "sufficient number of male and female jail staff on-duty and available to perform sensitive functions and procedures as necessary by prisoner gender, and total number of employees required to fill identified posts and functions"). As stated above, requiring two COs to perform each strip search is also consistent with the Jail's concerns regarding inmate and officer safety. (Riley Aff. (Doc. 17-5), ¶¶10, 12). Ms. Strozier has failed to establish a genuine issue as to whether the fifth proposed alternative is reasonable.

It should also be noted that Warren County has presented undisputed evidence that during Ms. Strozier's employment with the Jail, including the last year and one-half of her employment when the most significant need for female-only overtime and denied days off occurred (*see* Doc. 23, PageID 610-11), the Jail made efforts to recruit

17

and hire additional female COs (*see* Riley Aff. (Doc. 17-5), ¶¶26, 28-30). In 2018, the year Ms. Strozier resigned, the Jail was able to hire additional female COs and the amount of required female-only overtime was declining. (*Id.*).

Ms. Strozier has failed to create a genuine dispute as to the existence of any reasonable alternatives to the underlying female-only overtime policy. Accordingly, Warren County has met the third BFOQ prong. Because the Court finds that Warren County established the BFOQ defense, the Court does not reach Warren County's additional argument that the collective bargaining agreement precludes Ms. Strozier's lawsuit. (Doc. 17, PageID 288-89).

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Warren County's Motion for Summary Judgment (Doc. 17) and **DISMISSES WITH PREJUDICE** Plaintiff LaRhonda Strozier's claims against Warren County. Accordingly, the Clerk of Court shall terminate this case on the Court's active docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND